UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

---

LYNNE VAUGHN,

Plaintiff,

v.

Civil No.: 19-cv-00612

M&T BANK CORPORATION, ARTHUR MURPHY, NOEL CARROLL, SHELLIE PICONE, NICOLE KRAJNA, and MARIA MONROY,

Defendants.

---

**THE DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED FACTS**

# TABLE OF CONTENTS

Page No.

FACTS APPLICABLE TO ALL CLAIMS FOR RELIEF ....... 1

**I. RELEVANT PROCEDURAL HISTORY** ....... 1

**II. THE PARTIES** ....... 2

A. Plaintiff Lynne Vaughn ....... 2

1. Ms. Vaughn's Prior Work History ....... 2

B. M&T ....... 2

C. Arthur Murphy ....... 3

D. Noel Carroll ....... 4

E. Shellie Picone ....... 5

F. Nicole Krajna ....... 5

G. Maria Monroy ....... 5

**III. M&T'S ACQUISITION OF HUDSON CITY AND THE CONVERSION OF THE HUDSON CITY BRANCHES** ....... 6

**IV. THE EVENTS LEADING TO MS. VAUGHN'S TERMINATION** ....... 9

A. Ms. Vaughn Violates M&T Policies and Procedures ....... 9

B. M&T Employees Report Ms. Vaughn's Misconduct for Legitimate, Non-Discriminatory Reasons ....... 13

C. M&T Investigates Ms. Vaughn's Misconduct ....... 14

D. M&T Terminated Ms. Vaughn for Legitimate, Non-Discriminatory Reasons ....... 18

**V. MR. MURPHY'S SEPARATION FROM M&T** ....... 20

**VI. THERE IS NO EVIDENCE OF PRETEXT, AND THE RECORD CONCLUSIVELY DISPROVES MS. VAUGHN'S ALLEGATIONS** ....... 21

A. There is no Basis for Ms. Vaughn's Disparate Treatment Allegations, and Mr. Murphy was not the Cause of Ms. Vaughn's Termination. ....... 21

B. Ms. Vaughn's Employment Record is far from "Exemplary." Her Record Shows a Pattern and Practice of Policy Violations. ....... 22

C. Ms. Vaughn's Other Allegations of Pretext are Indisputably False. ....... 24

FACTS APPLICABLE TO COUNTS I-II (TITLE VII AND ADEA) ....... 25

FACTS APPLICABLE TO COUNTS III-IV (SECTION 1981 AND EXECUTIVE LAW) ....... 25

## FACTS APPLICABLE TO ALL CLAIMS FOR RELIEF

## I. RELEVANT PROCEDURAL HISTORY

1. Plaintiff Lynne Vaughn filed this lawsuit on January 23, 2019. In her Complaint, she asserts claims under the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act of 1967 (the "ADEA"), Section 1981 of the Civil Rights Act ("Section 1981"), and the New York Executive Law.

2. Ms. Vaughn contends that the defendants discriminated against her in her alleged employment with M&T Bank Corporation based on race, color, and age. (Fluskey[1] Ex. 1.)

3. The defendants filed Answers on March 5, 2019, denying all substantive allegations. (Fluskey ¶ 4 & Ex. 2.)

4. Before she filed this lawsuit, on October 16, 2016, Ms. Vaughn filed a Charge of Discrimination (the "Charge") with the Equal Opportunity Employment Commission (the "EEOC"). (Fluskey Ex. 3.)

5. In her EEOC Charge, Ms. Vaughn alleged discrimination based on race, color, and age arising out of her termination from "M&T Bank." She did not allege a hostile work environment harassment claim. (Fluskey Ex. 3 at ¶¶ 1, 4-19.)

6. On October 31, 2018, the EEOC issued a Dismissal and Notice of Rights determining that, based upon its investigation, it was unable to conclude that the information obtained established a violation of statute. (Fluskey Ex. 4.)

[1] "Fluskey" refers to the accompanying declaration of Robert Fluskey. "Carroll" refers to the accompanying declaration of Noel Carroll. "Bailey" refers to the accompanying declaration of Matthey Bailey. "Murphy" refers to the accompanying declaration of Arthur Murphy, Jr. "Krajna" refers to the accompanying declaration of Nicole Krajna. "Monroy" refers to the accompanying declaration of Maria Monroy.

## II. THE PARTIES

### A. Plaintiff Lynne Vaughn

7. Ms. Vaughn is a former employee of Manufacturers and Traders Trust Company ("M&T"). She became an employee of M&T in November 2015 as a result of M&T's acquisition of Hudson City Savings Bank ("Hudson City"). (Bailey ¶ 6; Fluskey Ex. 5 (Vaughn Depo.) at pp. 53:24 – 54:21.)

8. Ms. Vaughn was never employed by M&T Bank Corporation. (Bailey ¶ 6.)

9. M&T terminated Ms. Vaughn's employment on March 1, 2016. (Carroll ¶ 17; Murphy ¶ 35; Fluskey Ex. 5 (Vaughn Depo.) at pp. 122:7 – 123:23.) At the time of her termination, Ms. Vaughn was fifty years old. (Fluskey Ex. 5 (Vaughn Depo.) at p. 5:13-16.)

#### *1. Ms. Vaughn's Prior Work History*

10. Ms. Vaughn began working for Sound Federal Savings Bank ("Sound Federal") in 1984. (Fluskey Ex. 5 (Vaughn Depo.) at pp. 11:15 – 12:4.)

11. In 2006, Hudson City acquired Sound Federal. (Fluskey Ex. 5 (Vaughn Depo.) at pp. 16:15 – 17:6). Vaughn became an employee of Hudson City as a result of Hudson City's acquisition of Sound Federal. (*Id.*)

12. In 2007, Vaughn became the Branch Manager of Hudson City's branch located at 320 Mamaroneck Avenue in White Plains, New York (the "White Plains Branch"). (*Id.* at p. 21:19-24.)

13. Ms. Vaughn was the Branch Manager of Hudson City's White Plains Branch when M&T acquired Hudson City in November 2015. (*Id.* at pp. 53:24 – 55:21; Murphy ¶ 9.)

### B. M&T

14. Defendant M&T Bank Corporation is a bank holding company headquartered in Buffalo, New York. (Bailey ¶ 6.)

15. M&T (Manufacturers and Traders Trust Company) is a commercial bank headquartered in Buffalo, New York. It maintains retail bank branches in several states, including in New York. (*Id.* at ¶ 2.)

16. M&T is an equal opportunity employer. The company has an affirmative action program designed to identify, train, and promote qualified employees. (*Id.* at ¶ 4.)

17. M&T notifies all employees and applicants of its equal employment opportunity policies through its compliance with federal and state posting requirements and through written policies published on M&T's intranet. (*Id.* at ¶ 4 & Ex. 1.)

18. All of the policies considered to be part of M&T's "Employee Handbook" are available on the M&T intranet. All M&T employees sign an Acknowledgment of Receipt of Employee Handbook and Acknowledgment of Sexual and Other Unlawful Harassment Policy. (*Id.* at ¶ 4.)

19. Ms. Vaughn signed an Acknowledgment of Receipt of Employee Handbook and Acknowledgment of Sexual and Other Unlawful Harassment Policy. (*Id.* at ¶ 4 & Ex. 1 at MT-P005124.)

**C. Arthur Murphy**

20. Arthur Murphy is a former M&T employee. He became an M&T employee as result of M&T's acquisition of Hudson City. (Murphy ¶ 7.) He worked for M&T from November 2015 (when M&T acquired Hudson City) up to November 1, 2017. (Murphy ¶¶ 6-7, 41.)

21. Mr. Murphy served as a Regional Manager during his entire tenure with the M&T. (*Id.*). As an M&T Regional Manager, Mr. Murphy was responsible for overseeing about twenty M&T branches in Westchester County, New York and in Fairfield County, Connecticut. (*Id.* at ¶ 7.)

22. As an M&T Regional Manager, Mr. Murphy directly supervised about twenty employees (Branch Managers) of various ethnicities/races, including Caucasian, African-American, Hispanic, and Indian. (*Id.* at ¶ 8; Fluskey Ex. 6 (Murphy Depo.) at pp. 17:6 – 19:20 & 32:4-12.) The ages of the Branch Managers that he supervised at M&T varied widely, ranging from about forty years of age to about sixty-five years of age. (Murphy ¶ 8.)

23. At M&T, Mr. Murphy was Ms. Vaughn's direct supervisor. (*Id.* at ¶ 9.)

24. Mr. Murphy reported to Noel Carroll, M&T's Market Manager for Hudson Valley South (which included Westchester), New York City, Connecticut, and New Jersey. (*Id.* at ¶ 7.)

25. Before becoming an M&T employee, Mr. Murphy served as a Regional Manager for Hudson City from 2012 up to November 2015. (*Id.* at ¶¶ 4, 7.) As a Hudson City Regional Manager, Mr. Murphy was responsible for overseeing about twenty Hudson City branches in Westchester County, New York and in Fairfield County, Connecticut. (*Id.* at ¶ 4.)

26. As a Hudson City Regional Manager, Mr. Murphy directly supervised about twenty employees of various ethnicities/races, including Caucasian, African-American, Hispanic, and Indian. The ages of the Branch Managers that he supervised at Hudson City varied widely, ranging from about forty years of age to about sixty-five years of age. (*Id.* at ¶ 5.)

27. At Hudson City, Mr. Murphy served as Ms. Vaughn's direct supervisor from 2012 up to November 2015. (*Id.* at ¶ 9.)

**D. <u>Noel Carroll</u>**

28. Noel Carroll is a former M&T employee. He began working for M&T in 2005, and he retired in March 2019. (Carroll ¶ 1.)

29. From 2005 up to about November 2015, Mr. Carroll served as the Market Manager for M&T's Baltimore-area retail banking business. (*Id.* at ¶ 2.)

30. In or around November 2015, when M&T acquired Hudson City, M&T asked Mr. Carroll to oversee the integration of Hudson City into M&T. As a result, from about November 2015 to about February 2016, he supervised as an Integration Manager for M&T. (*Id.* at ¶ 3.)

31. In February 2016, after Hudson City's branches were converted to M&T branches, Mr. Carroll became the Market Manager for a region that encompassed the Lower Hudson Valley (which included Westchester County), New York City, Connecticut, and New Jersey. In that role, he was responsible for managing M&T's retail business in that region, which included more than 120 bank branches. Approximately nine Regional Managers reported directly to him. (*Id.*)

32. Mr. Murphy reported to Mr. Carroll. (*Id.* at ¶ 4.)

33. Mr. Carroll first met Mr. Murphy after M&T's acquisition of Hudson City. (*Id.*)

**E. <u>Shellie Picone</u>**

34. Shellie Picone served as an M&T Branch Manager for many years. After she retired, M&T rehired her to lead the Hudson City branch conversion process in the Lower Hudson Valley and Connecticut regions. She retired from M&T again (after the conversion was complete). Ms. Picone is now deceased. (*Id.* at ¶ 6.)

**F. <u>Nicole Krajna</u>**

35. Nicole Krajna is currently a Retail Sales Support Manager for M&T. From January 2015 to March 2017 (during the events at issue in this case), she served as the Branch Manager of M&T's Delaware-Hertel Branch in Buffalo, New York. (Krajna ¶ 2.)

**G. <u>Maria Monroy</u>**

36. Maria Monroy is currently the Branch Manager for M&T's Town Garden Branch, which is located in the City of Buffalo. (Monroy ¶ 3.)

37. Ms. Monroy first started working for M&T as a teller at M&T's Union Square Branch, which is located just outside the City of Buffalo. (*Id.*)

38. In February 2016 (during the events at issue in this case), Ms. Monroy was working as a Relationship Banker I at M&T. (*Id.* at ¶¶ 3, 8.)

39. Ms. Monroy was born and raised in Guatemala. She does not identify as Caucasian. Her primary language is Spanish. (*Id.* at ¶ 2.)

## III. M&T'S ACQUISITION OF HUDSON CITY AND THE CONVERSION OF THE HUDSON CITY BRANCHES

40. M&T completed its acquisition of Hudson City in November 2015. (Carroll ¶ 3.)

41. Upon acquiring Hudson City, M&T led a large training program for the former Hudson City employees, which included online courses and in-person workshops on M&T products, services, policies, and processes. (*Id.* at ¶ 5; Murphy ¶ 20.)

42. In January 2016, Ms. Vaughn received in-person M&T training, which lasted for approximately five days. (Fluskey Ex. 5 (Vaughn Depo.) at pp. 55:8 – 56:12.)

43. The in-person sessions that Ms. Vaughn attended included training on M&T's systems, account openings, and account closings. (Fluskey Ex. 5 (Vaughn Depo.) at pp. 57:5 – 58:4.)

44. Ms. Vaughn vaguely remembers receiving training on M&T money market accounts. (*Id.* at pp. 60:13 – 61:4.)

45. Before attending in-person training sessions in January 2016, Ms. Vaughn completed M&T web-based training. (*Id.* at pp. 63:16 – 65:24.)

46. Vaughn's "Training Transcript," generated from M&T's systems, summarizes the web-based and in-person trainings that Ms. Vaughn received. (*Id.* at pp. 63:8 – 65:24; Fluskey Ex. 11 (training transcript).)

47.     As part of M&T's conversion of Hudson City braches to M&T branches, M&T assigned numerous M&T employees to serve as "buddies" to assist the recently-acquired Hudson City branches with converting to M&T's platform and systems. Under the buddy program, buddies would work in the recently-acquired branches for about two weeks to provide training and support on M&T policies and systems. (Carroll ¶ 7; Krajna ¶ 4; Monroy ¶ 8; Fluskey Ex. 5 (Vaughn Depo.) at pp. 67:13 – 70:9.)

48.     One of the recently-acquired Hudson City branches was the White Plains Branch, where Ms. Vaughn was serving as the Branch Manager. (Carroll ¶ 8; Krajna ¶ 5; Monroy ¶ 9; Fluskey Ex. 5 (Vaughn Depo.) at p. 54:3-21.)

49.     M&T employee Nicole Krajna was assigned to be the "branch manager buddy" for the White Plains Branch. As a branch manager buddy, Ms. Krajna's role was to support the Branch Manager at the White Plains Branch (Ms. Vaughn) with the conversion to the M&T platform. (Carroll ¶ 9; Krajna ¶¶ 5-6; Monroy ¶ 11; Fluskey Ex. 5 (Vaughn Depo.) at pp. 67:13 – 70:9.)

50.     Ms. Krajna's role as a buddy included helping Ms. Vaughn and other branch employees to understand M&T policies, procedures, products, and services. (Carroll ¶ 9; Krajna ¶ 6; Monroy ¶ 11; Fluskey Ex. 5 (Vaughn Depo.) at pp. 67:13 – 70:9.)

51.     M&T employee Maria Monroy was assigned to be the "teller buddy" for the White Plains Branch. As a teller buddy, Ms. Monroy's role was to support the tellers at her assigned branch through the conversion to the M&T platform and to help branch employees understand M&T policies, procedures, products, and services. (Carroll ¶ 9; Krajna ¶ 9; Monroy ¶¶ 9-10.)

52.     The M&T buddies were assigned at random. Ms. Krajna and Ms. Monroy were not assigned to White Plains Branch to "watch over" Ms. Vaughn. (Carroll ¶ 10; Krajna ¶ 7; Monroy ¶ 11; Fluskey Decl. Ex. 8 (Monroy Depo.) at p. 44:9-12.)

53.     Mr. Murphy had no involvement with the assignment of M&T buddies. (Murphy ¶ 24; Fluskey Ex. 6 (Murphy Depo.) at pp. 69:7-15.)

54.     Ms. Krajna and Ms. Monroy had never worked with each other before being assigned as buddies for the White Plains Branch. (Krajna ¶ 9; Monroy ¶ 11.)

55.     After Ms. Krajna learned of her buddy assignment, she participated in a telephone call with Ms. Vaughn. This was the first time that Ms. Krajna spoke with Ms. Vaughn. (Krajna ¶ 7.)

56.     Ms. Krajna performed no research on Ms. Vaughn's background. No one provided Ms. Krajna with any information on Ms. Vaughn, other than her title and contact information. (Krajna ¶ 7.)

57.     On either February 11 or February 12 of 2016, Ms. Krajna and Ms. Monroy arrived on-site at the White Plains Branch. (Krajna ¶ 3; Monroy ¶ 13; Fluskey Ex. 5 (Vaughn Depo.) at pp. 67:17 – 69:4) This is when Ms. Krajna and Ms. Monroy first met Ms. Vaughn. (Krajna ¶ 9; Monroy ¶ 13.)

58.     The conversion of the White Plains Branch took place on Sunday, February 14, 2016 (over President's Day Weekend). On that day, information technology systems were converted and M&T's sign was placed on the outside of the building. (Krajna ¶ 10; Monroy ¶¶ 13-14.)

59.     During the White Plains Branch's first week of operation as an M&T branch (February 16-19, 2016), Ms. Krajna worked with Ms. Vaughn and other branch employees to

help them acclimate to the new platform. This included, for example, hosting morning meetings, reviewing M&T account documentation and product offerings, and answering questions of branch staff. (Krajna ¶ 11.)

## IV.   THE EVENTS LEADING TO MS. VAUGHN'S TERMINATION

### A.   Ms. Vaughn Violates M&T Policies and Procedures

60.     On February 22, 2016, two customers, a husband and wife, came into the White Plains Branch to request services. The customers were interested in opening a promotional money market savings account (an M&T "MyChoice Money Market account"), which carried a higher interest rate than a standard savings account. (Krajna ¶ 14; Fluskey Ex. 5 (Vaughn Depo.) at pp. 75:17 – 76:15.)

61.     M&T had been advertising the MyChoice Money Market account and had sent notices in the mail to some customers and prospective customers. (Krajna ¶ 14 & Ex. 1.)

62.     As with many promotional money market savings accounts, the M&T policy for the MyChoice Money Market account was that the higher, promotional interest rate was available only for "new money"—that is, money brought to M&T by the customer that was not already on deposit with M&T. (Krajna ¶¶ 15-16 & Ex. 1 at MT-P000346 Fn. 1; Monroy ¶ 19; Murphy ¶ 27.)

63.     When the two customers arrived at the branch on February 22, 2016, Ms. Vaughn was aware of the "new money" requirement as a result of promotional papers that M&T had distributed and because she was told about the new money requirement by other M&T personnel. (Fluskey Ex. 5 (Vaughn Depo.) at pp. 75:17 – 78:5; Fluskey Ex. 22 (Vaughn email to Department of Labor) at P-000156 (noting that she "did receive training specific to this promotion its [sic] for new money").)

64. Ms. Vaughn began speaking with these customers, and Ms. Vaughn called Ms. Krajna over to assist with the discussion. (Krajna ¶ 13; Fluskey Ex. 5 (Vaughn Depo.) at pp. 79:20 – 80:18; Fluskey Ex. 7 (Krajna Depo.) at p. 25.)

65. The customers had with them a check for $33,132.51 drawn on a third-party bank account. The customers also maintained an existing M&T savings account, initially opened with Hudson City, with a balance of $278,449.04. (Krajna ¶ 14; Monroy ¶ 18; Fluskey Ex. 5 (Vaughn Depo.) at pp. 82:23 – 83:6; Fluskey Ex. 7 (Krajna Depo.) at p. 25.)

66. Ms. Krajna explained that the promotional MyChoice Money Market account, and its higher interest rate, was available only for “new money” and that the customers could open a new MyChoice Money Market account and deposit into that account the $33,132.51 of new money that they brought with them. (Krajna ¶ 15; Fluskey Ex. 7 (Krajna Depo.) at pp. 25-26.)

67. The customers asked if they could also earn the higher, promotional interest rate of the MyChoice Money Market account on the funds in their existing savings account ($278,449.04). Ms. Krajna told them that the higher, promotional interest rate was available only for new money brought to M&T and that they could not combine the funds in their existing account with the new money that they had brought to the bank. (Krajna at ¶ 16; Fluskey Ex. 7 (Krajna Depo.) at pp. 26-27.)

68. Ms. Krajna informed Ms. Vaughn that the new funds (the $33,132.51 check) and the funds in the customers’ existing savings account would need to be kept in separate accounts, with the promotional rate applying only to the new funds. (Krajna ¶ 16.) Ms. Krajna then left Ms. Vaughn and the customers to assist other members of the branch team. (*Id.* at ¶ 17; Fluskey Ex. 7 (Krajna Depo.) at pp. 26-27.)

69.     Ms. Vaughn recalls that Ms. Krajna told her that M&T did not "prefer" allowing a customer to transfer funds already on account into a promotional money market savings account, but she cannot recall when Krajna told her that. (Fluskey Ex. 5 (Vaughn Depo.) at pp. 92:18 – 93:11.)

70.     Ms. Vaughn opened up a new MyChoice Money Market account for the customers. (*Id.* at pp. 107:2 – 108:10; Fluskey Ex. 13 (copy of account opening document, which was also marked as deposition exhibit 5); Monroy ¶ 18.)

71.     Ms. Vaughn directed the deposit of the customers' $33,132.51 check into the customers' MyChoice Money Market savings account. (Monroy ¶ 17-18; Fluskey Ex. 5 (Vaughn Depo.) at pp. 85:21 – 87:12.)

72.     Ms. Vaughn also presented to a branch teller, Ms. Olivia Antonio, a Work in Progress Ticket (a "WIP Ticket"). (Monroy ¶¶ 17-18 & Ex. 1; Fluskey Ex. 5 (Vaughn Depo.) at pp. 97:20 – 98:12; Fluskey Ex. 8 (Monroy Depo.) at 47-48.)

73.     A WIP ticket is used to close an account and to withdraw or transfer funds from a closed account. (Monroy ¶ 7; Fluskey Ex. 5 (Vaughn Depo.) at p. 94:2-24.)

74.     Ms. Vaughn completed and signed the WIP Ticket. (Fluskey Ex. 14 (copy of the WIP ticket); Monroy ¶¶ 17-18 & Ex. 1; Fluskey Ex. 5 (Vaughn Depo.) at pp. 109:17 –110:15.)

75.     The WIP Ticket showed $278,449.04 of funds in the customers' existing M&T account. (Fluskey Ex. 14; Monroy ¶¶ 17-18 & Ex. 1; Fluskey Ex. 5 (Vaughn Depo.) at pp. 110:19-23.)

76.     Using the WIP ticket, Ms. Vaughn directed Ms. Antonio to transfer the funds listed on the WIP Ticket into the customers' new MyChoice Money Market account. (Monroy ¶¶

17-18; Fluskey Ex. 5 (Vaughn Depo.) at pp. 109:17 – 110:15; Fluskey Ex. 8 (Monroy Depo.) at pp. 47-50.)

77. With this these instructions and the WIP ticket, Ms. Vaughn was combining in the MyChoice Money Market account the customers' new funds of $33,132.51 with the $278,449.04 that the customers already had on deposit with M&T. This meant that the higher, promotional interest rate of the MyChoice Money Market account would be applied to the $278,449.04—money which was already on deposit. (Monroy ¶ 18; Fluskey Ex. 8 (Monroy Depo.) at pp. 48-51; Fluskey Ex. 5 (Vaughn Depo.) at 110:19 – 111:16.)

78. When Ms. Vaughn presented the WIP Ticket to Ms. Antonio, Ms. Monroy was behind the teller line. Ms. Monroy told Ms. Vaughn that Ms. Vaughn should not process the transaction because it was against bank policy. (Monroy at ¶ 20; Fluskey Ex. 8 (Monroy Depo.) at pp. 49:13 – 51:6, 55:5-25, 102:10-24, 104:7-24.)

79. Ms. Monroy also told Ms. Vaughn that the transaction was "cheating bank policy," or words to that effect. (Monroy ¶ 20; Fluskey Ex. 5 (Vaughn Depo.) at pp. 99:1 – 100:22.)

80. Ms. Vaughn nevertheless instructed Ms. Antonio to proceed with the transaction. (Monroy ¶ 20; Fluskey Ex. 8 (Monroy Depo.) at pp. 49:13 – 50:11.)

81. Ms. Antonio was concerned. Ms. Monroy told Ms. Antonio that she was not at fault because her Branch Manager, Ms. Vaughn, had directed her to process the transaction. (Monroy ¶ 20.)

82. After the two customers left the branch, Ms. Vaughn approached Ms. Krajna and implied that she had done something wrong. Ms. Krajna asked Ms. Vaughn to explain what happened. Ms. Vaughn stated that the customers did not want to have two separate accounts, and

she did not believe that it was fair to force the customers to have two separate accounts. Ms. Vaughn explained that she decided to close the customers' existing savings account and to deposit both the savings account balance of $278,449.04 and the $33,132.51 check into the new MyChoice Money Market account. Ms. Krajna could not reverse this transaction because Ms. Vaughn had already completed it. (Krajna ¶ 19; Fluskey Ex. 7 (Krajna Depo.) at pp. 28-30.)

83. Ms. Krajna told Ms. Vaughn that she intended to report the incident to Ms. Picone because the transaction was against bank policy and contrary to the instructions that Ms. Krajna had provided. (Krajna ¶ 20; Fluskey Ex. 7 (Krajna Depo.) at pp. 28-30.)

84. Later in the day, Ms. Monroy observed Ms. Vaughn making light of the incident. Specifically Ms. Monroy heard Ms. Vaughn say in a joking and sarcastic manner: "hey guys, I'm a cheater" and "make way for the cheater," or words to that effect. (Monroy ¶ 21; Fluskey Ex. 8 (Monroy Depo.) at 102:10 – 103:14 & 120:16 – 121:9.)

### B. M&T Employees Report Ms. Vaughn's <u>Misconduct for Legitimate, Non-Discriminatory Reasons</u>

85. Later in the day on February 22, 2016, Ms. Krajna and Ms. Monroy spoke with Ms. Picone, who was the M&T representative responsible for leading the Hudson City branch conversion process in the Lower Hudson Valley and Connecticut regions. They informed Ms. Picone of Ms. Vaughn's actions earlier in the day. (Krajna ¶ 21; Monroy ¶ 22.)

86. Ms. Krajna told Ms. Picone about her conversation with Ms. Vaughn and the two customers, including the fact that she had told Ms. Vaughn that the higher, promotional interest rate could only be applied to new money, and not to the funds that the customers maintained in an existing savings account. Ms. Krajna informed Ms. Picone that Ms. Vaughn acted contrary to Ms. Krajna's instructions and M&T policies and procedures by combining the customers' new

money and the customers' funds that were already on deposit with M&T into the promotional MyChoice Money Market account. (Krajna ¶ 21.)

87. Ms. Monroy told Ms. Picone that Ms. Vaughn had combined in the MyChoice Money Market account the customers' new funds of $33,132.51 with the $278,449.04 that the customers already had on deposit, even though Ms. Monroy had told Ms. Vaughn that the transaction violated bank policy. Ms. Monroy also told Ms. Picone that Ms. Monroy heard Ms. Vaughn make light of the incident by saying "hey guys, I'm a cheater" and "make way for the cheater," or words to that effect. (Monroy ¶ 22.).

88. Ms. Krajna's and Ms. Monroy's decision to inform Ms. Picone of Ms. Vaughn's actions had nothing to do with Ms. Vaughn's race or age. They reported the incident because doing so was part of their job. (Krajna ¶ 22; Monroy ¶ 23.)

89. Ms. Krajna and Ms. Monroy never made any comments about Ms. Vaughn's race or age. They never heard anyone else make comments about Ms. Vaughn's race or age. (Krajna ¶ 22; Monroy ¶ 23; Fluskey Ex. 5 (Vaughn Depo.) at p. 137:18-24.)

**C. <u>M&T Investigates Ms. Vaughn's Misconduct</u>**

90. Ms. Picone informed Mr. Murphy (who was Ms. Vaughn's direct supervisor) and Mr. Carroll (who was Mr. Murphy's direct supervisor) of the incident that had occurred at the White Plains Branch on February 22, 2016. Ms. Picone conveyed to Mr. Murphy and Mr. Carroll what she had learned from Ms. Krajna and Ms. Monroy. (Murphy ¶ 27; Carroll ¶ 12; (Fluskey Ex. 10 (Carroll Depo.) at pp. 56:22 – 58:25.)

91. Before learning of the February 22, 2016 incident from Ms. Picone, Mr. Carroll had no conversations with any other M&T employees about Ms. Vaughn. (Fluskey Ex. 10 (Carroll Depo.) at pp. 56:22 – 57:8.)

92.     Mr. Carroll asked Ms. Picone to further investigate the matter and to involve

Matthew Bailey in the investigation. (Carroll ¶ 13; (Fluskey Ex. 10 (Carroll Depo.) at p. 60:7-23;

Bailey ¶ 10). Mr. Bailey was a Senior Employee Relations Specialist who provided assistance to

managers in retail banking when addressing employee relations issues. (Bailey ¶ 2).

93.     Mr. Bailey learned from Ms. Picone and Mr. Carroll the events that had occurred

on February 22, 2016 at the White Plains Branch—the events that were reported by Ms. Krajna

and Ms. Monroy to Ms. Picone. (*Id.* at ¶ 11.)

94.     Mr. Bailey had no knowledge of Ms. Vaughn before this incident was brought to

his attention. (*Id.* at ¶ 12).

95.     In connection with examining the matter, Mr. Bailey reviewed Ms. Vaughn's

personnel file with Hudson City, which also included her personnel records from Sound Federal.

Mr. Bailey learned that Ms. Vaughn had previously received corrective action notices and

warnings on numerous occasions from both institutions. The prior corrective actions arose from

policy violations, work performance issues, and complaints from other employees. (Bailey ¶ 13

& Ex. 2 (documents from Ms. Vaughn's personnel record).)

96.     Mr. Bailey suggested to Ms. Picone and to Mr. Murphy that they should obtain a

written statement of the February 22, 2016 incident from Ms. Vaughn. (Bailey ¶ 14; Murphy ¶

28.)

97.     On Friday, February 26, 2016, Mr. Murphy and Ms. Picone met with Ms. Vaughn

at the White Plains Branch to discuss the incident that had occurred on February 22, 2016. Mr.

Murphy and Ms. Picone summarized what they understood about the incident. They reiterated

that depositing the customers' new money and the customers' funds already on deposit into a

MyChoice Money Market account was a violation of bank policy. They also stated that

disregarding the express instructions of the buddies was inappropriate. (Murphy ¶ 29.)

98.     During the February 26, 2016 meeting, Ms. Vaughn admitted that she transferred

funds that the customers already had on deposit with M&T into the MyChoice Money Market

account and that, as a result, the customers would receive a higher interest rate on those existing

funds. Ms. Vaughn did not deny knowledge of M&T's policy that the higher, promotional rate

was available only for new money. (*Id.*; Fluskey Ex. 6 (Murphy Depo.) at pp. 87:12 – 88:14.)

99.     During the February 26, 2016 meeting, Ms. Vaughn stated that the February 22,

2016 incident was the result of "miscommunication." (Murphy ¶ 29.)

100.     During the February 26, 2016 meeting, Mr. Murphy and Ms. Picone asked Ms.

Vaughn to provide her own written account of what had occurred on February 22, 2016.

(Murphy ¶ 30; Fluskey Ex. 5 (Vaughn Depo.) at pp. 115:6 – 116:2.)

101.     Ms. Vaughn declined to provide a written account when requested. She said that

she wanted more time to write her statement. (Murphy ¶ 30; Fluskey Ex. 5 (Vaughn Depo.) at

pp. 115:6 – 116:2.)

102.     Mr. Murphy and Ms. Picone left the White Plains Branch on February 26, 2016

without any written statement from Ms. Vaughn. (Murphy ¶ 30; Fluskey Ex. 5 (Vaughn Depo.)

at pp. 115:6 – 116:2.)

103.     Mr. Murphy and Ms. Picone prepared a written "Recap" of the February 26, 2016

meeting with Ms. Vaughn. (Murphy ¶ 30 & Ex. 3.)

104.     Also on February 26, 2016, Ms. Picone asked Ms. Krajna and Ms. Monroy to

provide a joint statement summarizing the events of February 22, 2016. (Murphy ¶ 31; Krajna ¶

23; Monroy ¶ 24.)

105.    Ms. Krajna and Ms. Monroy provided a joint statement on February 26, 2016 in response to Ms. Picone's request. (Murphy ¶ 31; Krajna ¶ 23 & Ex. 2; Monroy ¶ 24.)

106.    Ms. Vaughn contends that she prepared a handwritten document on the afternoon of February 26, 2016 that summarized her account of the February 22, 2016 incident. (Fluskey Ex. 5 (Vaughn Depo.) at pp. 119:4 – 120:11.)

107.    During the period of February 26, 2016 through February 29, 2016, Ms. Vaughn never told Mr. Murphy or Ms. Picone that she had prepared a written statement, and she never attempted to provide them with her written statement. (Murphy ¶ 32; Fluskey Ex. 5 (Vaughn Depo.) at pp. 120:12 – 122:6.)

108.    Nothing prevented Ms. Vaughn from contacting Mr. Murphy or Ms. Picone to tell them that she had prepared a written statement on February 26, 2016. Fluskey Ex. 5 (Vaughn Depo.) at p. 182:3-22.)

109.    Mr. Carroll spoke to Ms. Picone further about the incident of February 22, 2016 and about Ms. Vaughn's actions following the incident, including Ms. Vaughn's failure to provide a written statement. (Carroll ¶ 15.)

110.    Mr. Carroll also spoke to Mr. Bailey further about the incident of February 22, 2016 and about Ms. Vaughn's actions following the incident, including Ms. Vaughn's failure to provide a written statement. (Carroll ¶ 15; Bailey ¶ 16.)

111.    Mr. Bailey spoke to Ms. Picone further about the incident of February 22, 2016 and about Ms. Vaughn's actions following the incident, including Ms. Vaughn's failure to provide a written statement. (Bailey ¶ 16.)

112.    Mr. Bailey and Mr. Carroll discussed options for addressing Ms. Vaughn's actions. (*Id.*; Carroll ¶ 15.)

**D. M&T Terminated Ms. Vaughn for Legitimate, Non-Discriminatory Reasons**

113. Based on the information and evidence before him, and his conversations with Mr. Bailey and Ms. Picone, Mr. Carroll decided to terminate Mr. Vaughn's employment. (Carroll ¶ 16; Fluskey Ex. 10 (Carroll Depo.) at pp. 62:21 – 63:11; Bailey ¶ 17; Fluskey Ex. 9 (Bailey Depo.) at pp. 30:4 – 31:11.)

114. M&T terminated Ms. Vaughn's employment because she violated bank policy and procedure relating to the MyChoice Money Market account, disregarded instructions of the buddies, and refused to cooperate in the investigation by providing a written statement when requested. (Carroll ¶ 16; Bailey ¶ 17; Fluskey Ex. 10 (Carroll Depo.) at pp. 62:21 – 63:11.; Murphy ¶ 35.)

115. M&T's employee relations department supported the decision and believed that such action was appropriate based on the evidence. (Bailey ¶ 17.)

116. Mr. Murphy did not recommend Ms. Vaughn's termination. He was consulted on the decision, and he did not object to it. (Murphy ¶ 34; Bailey ¶ 25; Fluskey Ex. 9 (Bailey Depo.) at pp. 30:4 – 31:11; Fluskey Ex. 10 (Carroll Depo.) at pp. 69:7 – 70:6; Fluskey Ex. 6 (Murphy Depo.) at pp. 107:18 – 111:2.)

117. Mr. Bailey prepared a written Employment Termination Summary, which identified the following violations: (1) falsifying a bank record by transferring customer funds already on deposit with M&T into the MyChoice Money Market account (opening a MyChoice Money Market account with comingled old and "new money"); (2) inflating revenue performance of the White Plains Branch by depositing existing funds into a promotional new money account; (3) providing customers with a promotional interest rate to which they were not entitled; (4) disregarding instructions from the conversion buddies (Ms. Krajna and Ms.

Monroy); and (5) refusing to cooperate in the investigation by providing a written statement of the incident to her supervisor when requested. (Bailey ¶ 17; Murphy ¶ 36 & Ex. 4.)

118.    Funding a MyChoice Money Market account with money already on deposit constituted creating a false record at M&T because the account (which is a bank record) included comingled old money and new money. (Fluskey Ex. 10 (Carroll Depo.) at pp. 102:7 – 103:2; Fluskey Ex. 6 (Murphy Depo.) at pp. 85:20 – 87:2; Fluskey Ex. 9 (Bailey Depo.) at pp. 115:10 – 118:8.)

119.    M&T's employee conduct policy in effect in 2016 stated that employees could be terminated for, among other things, failing to cooperate with internal investigations. (Bailey ¶ 17 & Ex. 3.)

120.    Mr. Bailey suggested that Mr. Carroll and Mr. Murphy arrange a termination meeting with Ms. Vaughn and summarize the reasons for the termination based on the Employment Termination Summary. (Bailey ¶ 18; Murphy ¶ 34.)

121.    On March 1, 2016, Mr. Carroll and Mr. Murphy met with Ms. Vaughn and terminated Ms. Vaughn's employment. Mr. Murphy read the Employment Termination Summary to Ms. Vaughn. (Murphy ¶¶ 35-36; Carroll ¶ 17; Fluskey Ex. 5 (Vaughn Depo.) at p. 123:6-19).

122.    During the meeting on March 1, 2016, Ms. Vaughn was informed that her termination arose from the incident that had occurred on February 22, 2016. (Fluskey Decl. Ex. 5 (Vaughn Depo.) at pp. 126:19 – 127:3.)

123.    During the March 1, 2016 meeting, Ms. Vaughn attempted to provide a document that she said was her written account of the incident of February 22, 2016. Mr. Carroll and Mr. Murphy explained that the termination decision had already been made, and they did not read or

take the document. (Murphy ¶ 37.) This was the first time Ms. Vaughn ever informed Mr.

Murphy or Mr. Carroll that she had prepared a written statement. (Murphy ¶ 32; Fluskey Ex. 5

(Vaughn Depo.) at p. 125:6-13.)

124.    Ms. Vaughn did not preserve her alleged handwritten account of the February 22,

2016 incident, and it has not been produced in this litigation. (Fluskey Ex. 5 (Vaughn Depo.) at

p. 127:4-12.)

125.    Mr. Carroll's, Mr. Murphy's, and Mr. Bailey' decisions with respect to Ms.

Vaughn's termination had nothing to do with Ms. Vaughn's race or age. Their decisions were not

motivated by Ms. Vaughn's race or age. (Carroll ¶ 18; Murphy ¶ 38; Bailey ¶ 19.)

126.    Mr. Bailey did not know Ms. Vaughn's race until she filed a charge with the

EEOC. (Bailey ¶ 19.)

127.    Ms. Krajna and Ms. Monroy played no role in the decision to terminate Ms.

Vaughn. They were not consulted on the decision. They first learned of the termination after it

had occurred. (Krajna ¶ 24; Monroy ¶ 25.)

128.    M&T maintains a Corrective Action Policy. The Policy summarizes different

types of corrective actions, such as coaching and written warnings. The Policy specifically states

that M&T is not required to progress through each type of corrective action before terminating

an employee. (Bailey ¶ 21 & Ex. 5 at MT-P005111-5112.)

129.    After Ms. Vaughn's termination, M&T assigned another M&T employee, Carl

Abate, to serve as the Branch Manager of the White Plains Branch. Mr. Abate was older than

Ms. Vaughn. (Bailey ¶ 20 & Ex. 4; Carroll ¶ 19; Murphy ¶ 39.)

## V.    MR. MURPHY'S SEPARATION FROM M&T

130.    In the fall of 2017, M&T received complaints from some of the Branch Managers

that Mr. Murphy supervised, including an anonymous complaint. The complaints indicated that

Mr. Murphy sometimes exhibited harsh behavior with Branch Managers. (Carroll ¶ 21; Bailey ¶ 23.)

131.    In October 2017, Mr. Carroll and Mr. Bailey conducted an investigation, which included interviewing several Branch Managers that reported to Mr. Murphy. The interviews revealed that many Branch Managers believed that Mr. Murphy employed a harsh management style. These complaints were expressed by younger and older Branch Managers, and by Branch Managers of different races/ethnicities. The complaints were expressed irrespective of race or age. (Carroll ¶ 21; Bailey ¶ 23; Fluskey Ex. 10 (Carroll Depo.) at pp. 46:23 – 47:19.)

132.    Mr. Carroll and Mr. Bailey met with Mr. Murphy twice in October 2017 to discuss the investigation. Internally, M&T made the decision to terminate Mr. Murphy's employment, without warnings or other forms of corrective action. But Mr. Murphy resigned his employment on October 18, 2017, effective November 1, 2017. (Carroll ¶ 22; Bailey ¶ 24.)

133.    The management-style issues that were revealed during the interviews of the Branch Managers who reported to Mr. Murphy had no impact on M&T's decision to terminate Ms. Vaughn's employment. Mr. Murphy did not witness the incident of February 22, 2016. Mr. Murphy did not report the incident of February 22, 2016. Mr. Murphy did not recommend Ms. Vaughn's termination. (Carroll ¶ 23; Bailey ¶ 25.)

## VI.    THERE IS NO EVIDENCE OF PRETEXT, AND THE RECORD CONCLUSIVELY DISPROVES MS. VAUGHN'S ALLEGATIONS

### A.    There is no Basis for Ms. Vaughn's Disparate Treatment Allegations, and Mr. Murphy was not the Cause of Ms. Vaughn's Termination.

134.    During her deposition, Ms. Vaughn identified two alleged items of "evidence" to support her claims of race/age discrimination: (1) the fact that she was terminated by M&T; and (2) Mr. Murphy's prior behavior as her manager. (Fluskey Ex. 5 (Vaughn Depo.) at p. 132:10-21.)

135. During the entire time that Mr. Murphy served as Ms. Vaughn's supervisor, he never made a comment to Ms. Vaughn about her race, color, or age. (Fluskey Ex. 5 (Vaughn Depo.) at p. 134:13-22).

136. During the entire time that Mr. Murphy served as Ms. Vaughn's supervisor, Ms. Vaughn never submitted any complaints to Hudson City or to M&T about Mr. Murphy. (Fluskey Ex. 5 (Vaughn Depo.) at pp. 134:23 – 135:3.)

137. Mr. Murphy did not recommend Ms. Vaughn's termination from M&T, and he is not the person who made the decision to terminate Ms. Vaughn's employment. (Bailey ¶ 17; Carroll ¶ 16; Murphy ¶ 34.)

### B. Ms. Vaughn's Employment Record is far from "Exemplary." Her Record Shows a Pattern and Practice of Policy Violations.

138. Ms. Vaughn alleges in her Complaint that she consistently received positive reviews during her employment with Hudson City and Sound Federal (Fluskey Ex. 1 at ¶¶ 16, 24) and that she provided "32 years of exemplary performance." (*Id.* at ¶ 71.)

139. During her employment with Hudson City and Sound Federal, Ms. Vaughn was formally reprimanded on multiple occasions for violating bank policy and for other serious infractions. For example:

a) In December 2013, Ms. Vaughn received formal corrective action (an "Employee Discussion Record") from Hudson City in connection with an attempted burglary that occurred at the White Plains branch over Veteran's Day weekend in 2013. (Murphy ¶¶ 12-14 & Ex. 2; Fluskey Ex. 5 (Vaughn Depo.) at pp. 22:25 – 45:3.) Ms. Vaughn had received a telephone call from Hudson City's alarm company while on vacation, but she did not contact the police, she did not obtain further information, and she did not contact her Assistant Branch Manager. As a result, on the Tuesday morning following the Veteran's Day holiday, her branch

employees entered the branch and discovered the break-in. (Murphy ¶¶ 12-14 & Ex. 2; Fluskey Ex. 5 (Vaughn Depo.) at pp. 22:25 – 25:18.) Ms. Vaughn was demoted from the title of Assistant Treasurer to Assistant Secretary. This was a change in title only, not compensation. (Murphy ¶ 13.) The Assistant Manager at the White Plains Branch, who was Caucasian, was also demoted. (Murphy ¶ 15; Fluskey Ex. 5 (Vaughn Depo.) at p. 44:6 – 15.)

b) Ms. Vaughn received a "below expectations" rating on her 2013 performance appraisal as a result of her actions in connection with the November 2013 attempted burglary. (Murphy ¶¶ 12-14 & Ex. 1 at MT000042; Fluskey Ex. 5 (Vaughn Depo.) at pp. 46:2 – 53:19.) Ms. Vaughn disagreed with the review and blamed her Assistant Branch Manager. (Murphy Ex. 1 at MT000045; Fluskey Ex. 5 (Vaughn Depo.) at pp. 51:17 – 52:14.)

c) On June 8, 2009, Ms. Vaughn's supervisor at Hudson City, William LaCaLamito, presented Ms. Vaughn with an employee "Discussion Record." (Fluskey Ex. 17 (marked as deposition exhibit 11).) Mr. LaCaLamito noted that an anonymous complaint had been placed to Hudson City's "Ethics Hotline" regarding Ms. Vaughn. Her staff believed that she did not communicate effectively, that she was unable to assist with operational/technical questions, and that she disciplined staff members in front of others. (*Id.*; Fluskey Ex. 5 (Vaughn Depo.) at pp. 242:21 – 246:11.)

d) On September 11, 2007, Mr. LaCaLamito delivered a Discussion Record to Ms. Vaughn and identified several policy violations at Ms. Vaughn's White Plains Branch, including sporadic auditing of the vault log book and transferring vault cash to an Assistant Branch Manager in violation of bank procedures. (Fluskey Ex. 18 (marked as deposition exhibit 12); Fluskey Ex. 5 (Vaughn Depo) at pp. 246:12 – 253:10.)

e) On September 26, 2006, Mr. LaCaLamito and Hudson City Vice President Adrienne Zuendt delivered a memorandum to Ms. Vaughn in which they summarized "points of concern regarding the performance, management and staffing of [Ms. Vaughn's] Mamaroneck branch." (Fluskey Ex. 19 (marked as deposition exhibit 13).) They noted that Ms. Vaughn appeared "unhappy with the HCSB [Hudson City] transition resulting in a negative attitude projecting to customers and staff." (*Id.*) They also explained that when Hudson City's "Buddies" tried to teach and train Ms. Vaughn's staff, Ms. Vaughn "resists and asks them to perform the tasks." (*Id.*; Fluskey Ex. 5 (Vaughn Depo.) at pp. 253:11 - 258:22.)

**C. Ms. Vaughn's Other Allegations of Pretext are Indisputably False.**

140. In her EEOC Charge, Ms. Vaughn alleged under oath that she was replaced by a "young, white male." (Fluskey Ex. 3 at ¶ 18 (EEOC Charge); Fluskey Ex. 5 (Vaughn Depo.) at pp. 214:19 – 215:4.) The "young, white male" that Vaughn referred to in her EEOC charge was Carl Abate. (Fluskey Ex. 5 (Vaughn Depo.) at p. 215:5-9.). Mr. Abate is older than Ms. Vaughn. (Bailey ¶ 20 & Ex. 4; Fluskey Ex. 5 (Vaughn Depo.) at p. 5:15-16.)

141. On July 5, 2017, Vaughn's predecessor counsel sent a letter to the EEOC in connection with Ms. Vaughn's EEOC Charge and claimed that Vaughn was "accused by . . . two young Caucasian women [Ms. Krajna and Ms. Monroy] of not following their instructions." (Fluskey Ex. 21; Fluskey Ex. 5 (Vaughn Depo.) at pp. 241:22 – 242:6). Ms. Monroy was born in Guatemala. She is not Caucasian. (Monroy ¶ 2.) While working at the White Plains branch, Ms. Monroy told Ms. Vaughn that she was from Guatemala, and she spoke Spanish in the branch on a few occasions. (Monroy ¶ 16.)

142. In her Complaint, Ms. Vaughn alleged that she was denied promotions at Hudson City that were afforded to other Caucasian Branch Managers. (Fluskey Ex. 1 at ¶ 32.) At Hudson City and at M&T, the next supervisory level above a Branch Manager is a Regional Manager.

During Mr. Murphy's tenure as a Regional Manager at Hudson City and at M&T, none of the Branch Managers in his region became a Regional Manager. (Murphy ¶ 17.)

143. In her Complaint, Ms. Vaughn alleged that she was the only African-American that reported to Mr. Murphy. (Fluskey Ex. 1 ¶ 29.) At least one other African-American reported to Mr. Murphy. (Murphy ¶18; Fluskey Ex. 5 (Vaughn Depo.) at pp. 143:16 – 144:10).

144. Vaughn alleged that Mr. Murphy "often" made sarcastic remarks to her. (Fluskey Ex. 1 at ¶ 35.) During her deposition, Ms. was only able to recall one allegedly sarcastic remark. (Fluskey Decl. Ex. 5 (Vaughn Depo.) at pp. 158:8 – 159:4.)

**FACTS APPLICABLE TO COUNTS I-II (TITLE VII AND ADEA)**

145. M&T terminated Ms. Vaughn's employment for legitimate, non-discriminatory reasons: she violated bank policy and procedure relating to the MyChoice Money Market account, disregarded instructions of the buddies, and refused to cooperate in an M&T investigation. (*Supra* ¶¶ 60-129) The defendants did not discriminate against Ms. Vaughn in her employment with M&T. (*Supra* ¶¶ 60-129, 134-144.)

146. Ms. Vaughn was never employed by M&T Bank Corporation (Bailey ¶ 6). She did not allege a hostile work environment claim in her EEOC Charge. (Fluskey Ex. 3.)

**FACTS APPLICABLE TO COUNTS III-IV (SECTION 1981 AND EXECUTIVE LAW)**

147. M&T terminated Ms. Vaughn's employment for legitimate, non-discriminatory reasons: she violated bank policy and procedure relating to the MyChoice Money Market account, disregarded instructions of the buddies, and refused to cooperate in an M&T investigation. (*Supra* ¶¶ 60-129.) The defendants did not discriminate against Ms. Vaughn in her employment with M&T. (*Supra* ¶¶ 60-129, 134-144.)

148. Krajna and Monroy played no role in the decision to terminate Ms. Vaughn's employment. They were not consulted on the decision. (*Supra* ¶ 127.)

Dated: June 2, 2020

**HODGSON RUSS LLP**

s/Rob Fluskey
By: Robert J. Fluskey, Jr.
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202-4040
Telephone: 716.848.1688

***Attorneys for Defendants***