UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

_____

LYNNE VAUGHN,

                              Plaintiff,

        v.                                                          Civil No.: 19-cv-00612

M&T BANK CORPORATION, ARTHUR MURPHY,
NOEL CARROLL, SHELLIE PICONE, NICOLE
KRAJNA, and MARIA MONROY,
                              Defendants.

_____

### DECLARATION OF MATTHEW BAILEY

        Matthew Bailey, under penalty of perjury and pursuant to 28 U.S.C. § 1746,

declares the following to be true and correct:

        1.        I am currently employed by Manufacturers and Traders Trust Company

("M&T") as a Senior Employee Relations Manager. I submit this declaration in support of the

defendants' motion for summary judgment. I have personal knowledge of the facts and events

summarized in this declaration.

        I.        **My Position with M&T**

        2.        M&T is a commercial bank headquartered in Buffalo, New York. It

maintains retail bank branches in several states, including in New York. I have been working in

M&T's Employee Relations Department since 2014. From about March 2014 to about mid-2015,

I served as an Employee Relations Specialist. From about mid-2015 through 2016, I served as a

Senior Employee Relations Specialist. I later served as an Employee Relations Manager. I now

serve as a Senior Employee Relations Manager. Before working in M&T's Employee Relations

Department, I served as an Assistant Branch Manager for M&T branches in New York City.

3.      As an Employee Relations Specialist and Employee Relations Manager, my job responsibilities have included helping managers in M&T's retail banking division performance-manage employees. I provide guidance on a wide range of employee relations matters, including performance evaluations, corrective action, and termination. As a result of my work in the Employee Relations Department, I have personal knowledge of M&T's human resources policies and procedures.

4.      M&T is an equal opportunity employer. The company has an ongoing affirmative action program designed to identify, train, and promote capable and qualified employees. M&T notifies all employees and applicants of its equal employment opportunity policies through its compliance with federal and state posting requirements and through written policies published on M&T's intranet. I have attached as **Exhibit 1** some of these policies that were in effect and available on M&T's intranet during the time of the plaintiff's employment with M&T. All of the policies considered to be part of M&T's Employee Handbook are available on the M&T intranet. All M&T employees sign an Acknowledgment of Receipt of Employee Handbook and Acknowledgment of Sexual and Other Unlawful Harassment Policy. Ms. Vaughn signed such an acknowledgement. *See* Ex. 1 at MT-P005124.

## II.     The Acquisition of Hudson City, Ms. Vaughn's Employment with M&T, and the Conversion Buddies

5.      In November 2015, M&T acquired Hudson City Savings Bank ("Hudson City"). In connection with that acquisition, M&T assigned numerous employees to serve as "buddies" to assist the recently-acquired Hudson City branches with converting to M&T's

platform and systems. Under the buddy program, buddies would work in the recently-acquired branches for about two weeks to provide training and support on M&T policies and systems.

6.      One of the recently-acquired Hudson City branches was located at 320 Mamaroneck Avenue, White Plains, New York 10605 (the "White Plains Branch"). Lynne Vaughn was the Branch Manager for the White Plains Branch. Ms. Vaughn became an employee of M&T as a result of the acquisition of Hudson City. Ms. Vaughn was an employee of M&T, not M&T Bank Corporation. M&T Bank Corporation is a bank holding company.

7.      M&T employee Nicole Krajna was assigned to be the "branch manager buddy" for the White Plains Branch. As a branch manager buddy, Ms. Krajna's role was to support the Branch Manager at the White Plains Branch, Lynne Vaughn, with the conversion to the M&T platform. This included helping Ms. Vaughn and other branch employees to understand M&T policies, procedures, products, and services. M&T employee Maria Monroy was assigned to be the "teller buddy" for the White Plains Branch. As a teller buddy, Ms. Monroy's role was to support the tellers at her assigned branch through the conversion to the M&T platform and to help branch employees understand M&T policies, procedures, products, and services.

8.      I had no involvement with the assignment of M&T buddies. I had no discussions with anyone at M&T about the assignment of any buddies, including the assignment of buddies to the White Plains Branch.

9.      The conversion of the White Plains Branch took place in mid-February 2016 (over President's Day Weekend).

### III. Ms. Vaughn's Policy Violations and Her Termination

10. In late February 2016, either Shellie Picone or Noel Carroll[1] brought to my attention an incident that had occurred at the White Plains Branch on February 22, 2016. At that time, I was a Senior Employee Relations Specialist. Ms. Picone was responsible for leading the conversion of the Hudson City branches in the region that encompassed the White Plains Branch. Mr. Carroll was the Market Manager responsible for overseeing all retail branch operations in the Lower Hudson Valley (which included Westchester County), New York City, Connecticut, and New Jersey.

11. I learned from Ms. Picone and Mr. Carroll that Ms. Vaughn had transferred into a new MyChoice Money Market savings account funds that certain customers already had on deposit with the bank. This was a violation of bank policy. As with many promotional money market savings accounts, the higher, promotional interest rate of the MyChoice Money Market account was available only for "new money"—money brought to M&T by the customer that was not already on deposit with M&T. Ms. Vaughn had combined in a MyChoice Money Market account the customers' new money (a customer check) with the customers' funds already on deposit, even though the two M&T buddies assigned to the White Plains Branch (Ms. Krajna and Ms. Monroy) told Ms. Vaughn that she should not perform such a transaction.

---

[1] I cannot recall whether Ms. Picone or Mr. Carroll first brought the incident to my attention.

12.     I had no knowledge of Ms. Vaughn before this incident was brought to my attention in late February. Ms. Picone and Mr. Carroll asked for my employee relations assistance on the matter.

13.     In connection with examining the matter, I reviewed Ms. Vaughn's personnel file with Hudson City, which also included her personnel records from Sound Federal, where she worked prior to Hudson City's acquisition of Sound Federal. In doing so, I learned that Ms. Vaughn had previously received corrective action notices and warnings on numerous occasions from both institutions. The prior corrective actions arose from policy violations and work performance problems. For example, in 2013, Ms. Vaughn was demoted and received a written warning for exercising poor judgment and violating bank policy in connection with an attempted burglary at her branch. Ms. Vaughn had also received multiple written warnings relating to other branch policy violations and complaints from other employees. Ms. Vaughn's personnel file demonstrated that the February 22, 2016 incident was not the first time that Ms. had violated bank policy. There was a history of such action. These corrective action documents (and related documents from Ms. Vaughn's personnel file) are attached as **Exhibit 2.**

14.     I suggested to Ms. Picone and to Arthur Murphy (Ms. Vaughn's direct supervisor) that they should obtain a written statement of the incident from Ms. Vaughn.

15.     I later learned that Ms. Picone and Mr. Murphy asked Ms. Vaughn for a written statement during an in-person meeting, and Ms. Vaughn refused to provide a written statement during the meeting. Ms. Krajna and Ms. Monroy provided a joint statement in response to Ms. Picone's request. I reviewed their joint statement.

16.     I spoke to Ms. Picone further about the incident of February 22 and about Ms. Vaughn's actions following the incident, including Ms. Vaughn's failure to provide a written statement. I also spoke to Mr. Carroll about the incident of February 22 and about Ms. Vaughn's actions following the incident, including Ms. Vaughn's failure to provide a written statement. I discussed the matter with Mr. Murphy. Mr. Carroll and I discussed options for addressing Ms. Vaughn's actions.

17.     Mr. Carroll decided to terminate Mr. Vaughn's employment. I supported the termination, and I believed that such action was appropriate based on the evidence. Ms. Vaughn's employment was terminated because she violated bank policy and procedure relating to the MyChoice Money Market account, disregarded instructions of the buddies, and refused to cooperate in the investigation by providing a written statement when requested. I prepared an Employment Termination Summary, a copy of which is attached as Exhibit 4 to Mr. Murphy's accompanying declaration. The Employment Termination Summary identified the following violations: (1) falsifying a bank record by transferring customer funds already on deposit with M&T into the MyChoice Money Market account (opening a MyChoice Money Market account with comingled old and "new money"); (2) inflating revenue performance of the White Plains Branch by depositing existing funds into a promotional new money account; (3) providing customers with a promotional interest rate to which they were not entitled; (4) disregarding instructions from the conversion buddies (Ms. Krajna and Ms. Vaughn); and (5) refusing to cooperate in the investigation by providing a written statement of the incident to her supervisor when requested. M&T's employee conduct policy in effect in 2016 stated that employees could

be terminated for, among other things, failing to cooperate with internal investigations. A copy of that policy is attached as **Exhibit 3**.

18.    I suggested that Mr. Carroll or Mr. Murphy arrange a termination meeting with Ms. Vaughn and summarize the reasons for the termination based on the Employment Termination Summary. On March 1, 2017, Mr. Carroll and Mr. Murphy terminated Ms. Vaughn's employment. I did not attend the termination meeting.

19.    My decisions relating to the termination of Ms. Vaughn's employment had nothing to do with Ms. Vaughn's race or age. In fact, I did not know Ms. Vaughn's race until she filed a charge with the EEOC. My decisions were not motivated by Ms. Vaughn's race or age. My investigation of the incident of February 22, 2016 was not motivated by Ms. Vaughn's race or age.

20.    After Ms. Vaughn's termination, M&T assigned Carl Abate to serve as the Branch Manager of the White Plains Branch. I have attached as **Exhibit 4** an employee profile of Carl Abate from M&T's human resources system. Mr. Abate was born on January 22, 1959. He is older than Ms. Vaughn. The profile indicates that Mr. Abate identifies as "two or more races."

21.    M&T maintains a Corrective Action Policy. I have attached as **Exhibit 5** the M&T Corrective Action Policy in effect in February and March of 2016. The Policy summarizes different types of corrective actions, such as coaching and written warnings. The Policy specifically states that M&T is not required to progress through each type of corrective action before terminating an employee: "M&T Bank retains the right to administer corrective action in a flexible manner depending on the circumstances, including accelerating the process.

This policy does not modify the status of employees as employees-at-will or in any way restrict M&T Bank's right to bypass the corrective action procedures suggested." Ex. 5 at MT-P005111. The Policy also provides as follows: "Accelerated corrective action, up to and including termination of employment, is used when one or more steps of the corrective action process are bypassed. Accelerated action may occur in certain situations, such as when an employee commits a serious infraction or policy violation. A decision to bypass any steps in the corrective action process is within M&T Bank's discretion." Ex. 4 at MT-P005112.

**IV.    Mr. Murphy's Separation from M&T**

22.     In late 2016, M&T received survey results and feedback on Mr. Murphy's management performance as part of the "Precision Leadership Program."  Through this program at M&T, Branch Managers provide anonymous feedback about their Regional Manager. M&T regularly utilizes the Precision Leadership Program with Regional Managers. It is my understanding that the Precision Leadership Program results showed that some Branch Managers believed that Mr. Murphy's management style was too harsh. I believe that Mr. Carroll met with Mr. Murphy to discuss these issues in January 2017.

23.     In the fall of 2017, M&T received complaints from some of the Branch Managers that Mr. Murphy supervised, including an anonymous complaint. The complaints indicated that Mr. Murphy exhibited harsh behavior with Branch Managers. Mr. Carroll and I conducted an investigation into these complaints. In October 2017, I conducted telephone interviews of approximately five Branch Managers that reported to Mr. Murphy. It is my understanding that Mr. Carroll interviewed approximately four Branch Managers that reported to Mr. Murphy. The interviews revealed that many Branch Managers believed that Mr. Murphy

employed a harsh management style. These complaints were expressed by younger and older Branch Managers, and by Branch Managers of different races/ethnicities. The complaints were expressed irrespective of race or age.

24. Mr. Carroll and I met with Mr. Murphy twice in October 2017 to discuss the results of our investigation. Mr. Carroll and I explained that the conduct identified in the investigation could not be tolerated. Internally, M&T made the decision to terminate Mr. Murphy's employment, without warnings or other forms of corrective action. But Mr. Murphy resigned his employment on October 18, 2017, effective November 1, 2017.

25. The management issues that were revealed during my interviews of the Branch Managers who reported to Mr. Murphy had no impact on M&T's decision to terminate Ms. Vaughn's employment. Mr. Murphy did not witness the incident of February 22, 2016. Mr. Murphy did not report the incident of February 22, 2016. The incident was reported by two employees—Ms. Krajna and Ms. Monroy—who had no prior work involvement with Ms. Vaughn. Mr. Murphy did not recommend Ms. Vaughn's termination. The final decision on Ms. Vaughn's termination was made by Mr. Carroll, who had no prior work involvement with Ms. Vaughn.

Executed: May 29, 2020

_____
Matthew Bailey

15499828v6